

SUSAN HAWK
CRIMINAL DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

WR-81,594-03
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/19/2015 11:55:56 AM
Accepted 11/19/2015 1:03:21 PM
ABEL ACOSTA
CLERK

November 19, 2015

RECEIVED
COURT OF CRIMINAL APPEALS
11/19/2015
ABEL ACOSTA, CLERK

Abel Acosta, Clerk of the Court
Court of Criminal Appeals
P.O. Box 12308
Capitol Station
Austin, Texas 78711

Re:     Court of Criminal Appeals Writ Nos. WR-81,594-03;
        Trial Court Cause No. W10-00566-V(B);
        *Ex parte Jerrell Glenn Dittman*

Dear Mr. Acosta:

On October 1, 2014, Jerrell Glenn Dittman filed an application for writ of habeas corpus. On November 13, 2014, the Dallas County District Clerk's Office transmitted the record to the Court. On March 4, 2015, the writ was remanded to the trial court for findings. On September 11, 2015, the trial court conducted an evidentiary hearing. On October 23, 2015, Applicant filed proposed findings of fact and conclusions of law. On October 26, 2015, the State filed proposed findings of fact and conclusions of law. On October 28, 2015, the trial court signed findings recommending the denial of relief on Applicant's claims. On November 4, 2015, the Dallas County District Clerk's Office filed a Supplemental Clerk's Record in the above-mentioned cases. That supplemental record does not contain the State's proposed findings of fact and conclusions of law.

Please allow this letter to serve as notice that today, the undersigned contacted the District Clerk's Office and requested that a supplemental clerk's record containing the State's proposed findings be transmitted to the Court. A copy of the State's proposed findings is attached to this letter. I expect that the Clerk's Office will send a supplemental record shortly.

If you have any questions or concerns, please feel free to contact me.

Frank Crowley Courts Building, 133 North Riverfront Boulevard, LB-19 Dallas, Texas 75207-4399  (214) 653-3600

Sincerely,

Christine Womble
Assistant District Attorney
State Bar No. 24035991
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

cc:     Robert Burns (via email; without enclosure)
        Bruce Anton (via email; without enclosure)

## WRIT NO. W10-00566-V(B)

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE CRIMINAL DISTRICT** |
| | § | **COURT NO. 2** |
| **JERRELL GLENN DITTMAN** . | § | **DALLAS COUNTY, TEXAS** |

## STATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

On this, the _____ day of _____, 2015, came on to be considered Applicant's Application for Writ of Habeas Corpus, the State's Response. Having considered these pleadings and the official court records, all exhibits and affidavits offered by the parties, as well as testimony and evidence offered at the evidentiary hearing conducted on September 11, 2015, the Court enters the following findings of fact and conclusions of law.

### I.

### HISTORY OF THE CASE

Applicant pleaded not guilty to felony murder. The jury found Applicant guilty and the Court sentenced him to 35 years' confinement in the Institutional Division of the Texas Department of Criminal Justice. Applicant's conviction was affirmed by the Fifth District Court of Appeals. *See Dittman v. State*, No. 05-11-00345-CR (Tex. App.—Dallas Aug. 3, 2012) (not designated for publication).

1

On October 1, 2014, Applicant filed the instant Application for Writ of Habeas Corpus. In his application, Applicant raised the following grounds for relief:

- Ineffective assistance of counsel (Grounds 1-4); and

- Excessive sentence/selective prosecution (Ground 5).

On November 13, 2014, the Dallas County District Clerk's Office transmitted the record to the Court of Criminal Appeals. On March 4, 2015, the writ was remanded to the trial court. On September 11, 2015, this Court conducted an evidentiary hearing in connection with Applicant's writ. Applicant presented testimony from his trial attorneys, Mr. J.R. Cook and Mr. Paul Johnson.

## II.

## JUDICIAL NOTICE

1. This Court takes judicial notice of the entire contents of the Court's file in Cause No. F10-00566.

2. This Court takes judicial notice of all seven volumes of the reporter's record of the trial, which was conducted in February 2011, in the aforementioned cause number. Citations to this record will be "RR-." Citations to trial exhibits will be "SX-" and "DX-."

3. This Court takes judicial notice of the entire contents of the Court's writ file in Cause No. W10-00566-V(B).

4. This Court takes judicial notice of the reporter's record of the evidentiary hearing conducted on the instant writ. Citations to this record will be "WRR-." Citations to writ exhibits will be "WSX-" and WDX-."

2

# III.

# ISSUES TO BE DECIDED

On March 4, 2015, the Court of Criminal Appeals remanded the instant application for additional evidence. The order provides, in pertinent part, as follows:

> The trial court shall determine whether Applicant's blood was drawn by hospital personnel solely for medical purposes and not at the request of a peace officer. *See State v. Hardy*, 963 S.W.2d 516, 527 (Tex. Crim. App. 1997). If the trial court finds that Applicant's blood was drawn at the request of a peace officer, it shall determine whether (1) Applicant was under arrest for an offense under Chapter 49 of the Penal Code at the time of the blood draw, (2) his blood was drawn pursuant to a search warrant, (3) he consented to a blood draw authorized by a peace officer, and (4) exigent circumstances existed. The trial court shall then determine whether trial counsel was deficient and Applicant was prejudiced.

*Ex parte Dittman*, WR-81,594-03, 2015 Tex. Crim. App. Unpub. LEXIS 173, at *3 (Tex. Crim. App. March 4, 2015) (not designated for publication).

# IV.

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

## APPLICANT'S BLOOD

### The Offense

1.  While driving under the influence of alcohol, Applicant crashed into a truck, killing the passenger, Fannie Kind.

3

2. The crash occurred on April 9, 2009 between 10:30 p.m. and 10:55 p.m.[1] (*See* Attachment A).

3. Applicant sustained severe injuries during the crash. (WRR:32; SX55; WSX2). He was transported by ambulance from the scene of the crash to Baylor Hospital. He was unconscious.[2] (SX55; WSX2).

4. In the hours after the offense, Applicant's blood was drawn twice. The first time was for medical purposes. The second time was for law enforcement purposes. Both samples showed that Applicant was intoxicated.

*Medical-Purposes Blood Draw*

5. At the hospital, at 11:48 p.m., Dr. Andrew Markowski ordered that Applicant's blood be drawn and tested for, among other things, an alcohol level serum. (SX55; WSX2).

6. The hospital pathology report reflects that the alcohol serum level at 12:10 a.m. was 242 mg/dl.[3] (SX55; WSX2). The alcohol serum level at 4:30 a.m. was 151 mg/dl. (SX55; WSX2).

7. At trial, Applicant's medical records were offered into evidence without objection as State's Exhibit 55. (RR4:59). Contained within those records is Dr. Markowski's order for Applicant's blood to be drawn as well as the pathology report showing the result of that test. (SX55:WSX2).

8. Prior to trial, the defense had a copy of Applicant's medical records. (RR4:59).

9. At the September 11, 2015 evidentiary hearing conducted on the instant writ, Cook testified that he discussed Applicant's medical records with Applicant. (WRR:17). Cook testified:

---

[1] The incident report reflects that emergency personnel were dispatched at 10:55 p.m. (*See* Attachment A).

[2] The Mesquite Fire Department E.M.S. "run sheet" recites that Applicant was "Unconscious, gasping for air[.]" (SX55l; WSX2).

[3] The pathology report reflects that the time of the first alcohol serum level was on 4/9/09 at 12:10 a.m. (SX55; WSX2). This appears to be a clerical error as the blood was not even ordered to be drawn until 4/9/09 at 11:48 p.m. (SX55; WSX2).

4

> I'm sure - - I'm sure we went over the medical records, and I'm sure I told him that, they pulled your blood medicinally and they're gonna get the results in.
>
> (WRR:18).

10. On habeas, Applicant presented no evidence or argument showing that Dr. Markowski's order for Applicant's blood was not for medical purposes.

11. There is no reasonable expectation of privacy in protecting blood alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic accident. *State v. Hardy*, 963 S.W.2d 516, 527 (Tex. Crim. App. 1997).

12. In a post-conviction collateral attack, the burden is on the applicant to allege and prove facts which, if true, entitle him to relief. *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985). The standard of proof is by a preponderance of the evidence. *See Ex parte Adams*, 768 S.W.2d 281, 287-88 (Tex. Crim. App. 1989).

### *Mandatory Blood Draw: Tex. Transp. Code Ann. 724.012(b)*

13. At 2:25 a.m., Officer John Paul Bohmer of the Mesquite Police Department requested that a sample of Applicant's blood be drawn pursuant to the mandatory blood draw statute. (SX57). Applicant's blood was drawn by Nurse Michael Redden. (SX57).

14. After the mandatory blood draw, Applicant, who was unconscious, remained at the hospital to receive medical treatment. (SX55; WSX2).

15. Applicant was discharged from the hospital on April 13, 2009. (SX55; WSX2).

16. The Mesquite Police Department filed a case against Applicant for the offense of intoxication manslaughter on February 4, 2010.

17. The blood drawn pursuant to Officer Bohmer's request was tested at the Southwestern Institute of Forensic Sciences. The alcohol concentration was 0.16 grams ethanol per 100 mL blood. (SX61).

18. At trial, Officer Bohmer testified regarding his participation in the investigation of the instant offense. (RR4:119). After he worked the scene of the crash, he went to Baylor Hospital to identify the individuals involved. (RR4:119-20). Applicant was unconscious and receiving medical attention. (RR4:121).

19. Officer Bohmer testified that at that time, he had probable cause to arrest Applicant for "manslaughter" because there was "an accident involving a death." (RR4:121-22).

20. Officer Bohmer testified regarding his purpose in seeing Applicant at the hospital:

> To determine who he was and to do a mandatory blood draw. Anytime there's an accident involving serious bodily injury or death, in this case, we had both, we do a mandatory blood draw for the party that could be involved.

(RR4:122).

21. Prior to the blood draw, Officer Bohmer read a statutory warning to Applicant. (RR4:122-23). He did this even though Applicant was unconscious at the time. (RR4:122).

22. Officer Bohmer described the statutory warning as follows:

> It's basically just telling someone that they are arrested under - - for an alleged act of drunk driving or driving while intoxicated, a motor vehicle, watercraft, something like that, and that I'm requesting a specimen of their breath or blood, in this case, blood.

(RR4:123-24).

23. At trial, the State presented the Statutory Authorization-Mandatory Blood Specimen form that Officer Bohmer completed when he requested that a specimen of Applicant's blood be drawn at the hospital. (SX56). The authorization form recites, in pertinent part, the following:

> Pursuant to the provisions of Tex. Trans. Code Ann. § 724.012,

6

the undersigned peace officer requires that John Doe LTR #01276435 give a specimen or specimens of blood under the provisions of the Tex. Transp. Code Ann. Ch. 724, subch. B.

Acting in my capacity as a peace officer, I have arrested the above-named person for an offense under Chapter 49 of the Texas Penal Code; such person was the operator of a motor vehicle or watercraft, involved in an accident that I reasonably believed occurred as a result of the offense. When I arrested the above-named person, I reasonably believed that another person had died or would die as a result of the accident, and the above-named person has prior to the issuance of this order refused my request to voluntarily give an appropriate specimen or specimens under the authority of Tex. Trans. Code Ann. Ch. 724.

(SX56).

24. Applicant was under arrest at the time of the mandatory blood draw. Officer Bohmer testified that he read a statutory warning to Applicant prior to the blood draw and that warning informed Applicant that he was under arrest. (RR4:123). The statutory authorization form Officer Bohmer completed to request that a sample of Applicant's blood be drawn recites that he "[has] arrested the above-named person for an offense under Chapter 49 of the Texas Penal Code[.]" (SX56).

25. Applicant has failed to present any evidence showing that he was not, in fact, under arrest at the time of the mandatory blood draw.

26. In a post-conviction collateral attack, the burden is on the applicant to allege and prove facts which, if true, entitle him to relief. *Maldonado*, 688 S.W.2d at 116. The standard of proof is by a preponderance of the evidence. *See Adams*, 768 S.W.2d at 287-88.

27. It is not clear from the evidence at trial the specific offense for which Applicant was under arrest at the time Officer Bohmer requested that Applicant's blood be drawn pursuant to the mandatory blood draw statute. According to State's Exhibit 56, at the time of the mandatory blood draw, Applicant was under arrest *for an offense under Chapter 49 of the Texas Penal Code*. (SX56). At trial, Officer Bohmer testified that he had

7

probable cause to arrest Applicant for "manslaughter." (RR4:121-22). He did not specify that he had probable cause to arrest Applicant for intoxication manslaughter. In describing the statutory warning that he read to Applicant prior to the draw, however, he stated that the warning informs the individual that "they are arrested under - - *for an alleged act of drunk driving or driving while intoxicated[,]*" an offense that is contained within Chapter 49 of the Texas Penal Code. (RR4:123-24) (emphasis added). This testimony conflicts with testimony Officer Bohmer gave during cross-examination. The following exchange took place during cross-examination:

> [Defense counsel]: The prosecutor asked you some questions a few minutes ago and I just want to follow up on a couple of those things. He said that when you came into contact with the person at the hospital, that based on the information that you had provided to you at that time that was in your grasp, that you had enough at that point to charge him with manslaughter; is that correct?

> [Officer Bohmer]: Correct.

> [Defense counsel]: Can you explain to me why it was or what was your line of thinking that would have caused you at that point to charge him with manslaughter?

> [Officer Bohmer]: Well, for manslaughter, you just have to be reckless in your actions and cause the death, a death of another. And we had that, based on the roadway signs of the roadway, what witnesses were saying, that he was driving at a high rate of speed, changing lanes unsafe at the last minute, and we had a death of an individual.

> [Defense counsel]: You believed him to be intoxicated at that time?

> [Officer Bohmer]: I had not spoken to him at that time, no, sir.

> [Defense counsel]: you are familiar with intoxication manslaughter, are you not?

8

[Officer Bohmer]: Yes, sir.

[Defense counsel]: And that's actually the charge, if your person is intoxicated, you have to do something that's - - if you cause someone's death by accident and you are intoxicated, then you are guilty of the offense of manslaughter, intoxication manslaughter, are you not?

[Officer Bohmer]: Yes, sir.

[Defense counsel]: Okay. And you don't have to - - actually you don't even have to be reckless in doing so, do you?

[Officer Bohmer]: No, sir.

(RR4:133-34).

28. Section 724.012(b) of the Texas Transportation Code requires an officer to obtain a sample of a person's blood in the event of a motor vehicle accident if the person is arrested for an offense under Chapter 49 of the Penal Code involving the operation of a motor vehicle; the person was the operator of a motor vehicle involved in the accident; the officer reasonably believes the accident occurred as a result of the offense; and a person has or will die as a result of the accident. *See* Tex. Transp. Code Ann. 724.012(b).[4]

29. If Applicant was, in fact, under arrest for an offense under Chapter 49, then the blood draw requested by Officer Bohmer would have been valid at the time of trial.

### Implied Consent: Tex. Transp. Code Ann. 724.011

30. Assuming *arguendo*, that the police-requested sample of Applicant's blood

---

[4] The State recognizes that on November 26, 2014, in *State v. Villarreal*, the Court of Criminal Appeals held that "a nonconsensual search of a DWI suspect's blood conducted pursuant to the mandatory-blood-draw and implied-consent provisions in the Transportation Code, when undertaken in the absence of a warrant or any applicable exception to the warrant requirement, violates the Fourth Amendment." No. PD-0306-14, 2014 Tex. Crim. App. LEXIS 1898, at *79 (Tex. Crim. App. Nov. 26, 2014) (not yet published) (reh'g granted). *Villarreal* was decided after Applicant's conviction became final. Additionally, on February 25, 2015, the Court of Criminal Appeals granted rehearing in *Villarreal*.

9

is invalid under Section 724.012(b), it is nevertheless valid under Section 724.011(a).

31. Section 724.011(a) provides as follows:

> If a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place, or a watercraft, while intoxicated, or an offense under Section 106.041, Alcoholic Beverage Code, the person is deemed to have consented, subject to this chapter to submit to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol concentration or the presence in the person's body of a controlled substance, drug, dangerous drug, or other substance.

> Tex. Trans. Code Ann. § 724.011.

32. According to Officer Bohmer, at the time of the police-requested blood draw, Applicant was under arrest for an offense that occurred while Applicant was driving a motor vehicle.

33. Applicant's consent was valid under Section 724.011 even though he was unconscious at the time. *See* Tex. Transp. Code Ann. §724.014 (providing that a person who is dead, unconscious, or otherwise incapable of refusal is considered not to have withdrawn consent provided by 724.011).[5]

*Search Warrant*

34. Applicant's blood was not drawn pursuant to a search warrant.

---

[5] The State recognizes that at least two courts of appeals have recently held that the implied consent statute is not an exception to the warrant requirement. *See Forsyth v. State*, 438 S.W.3d 216, 223 (Tex. App.—Eastland 2014, pet. ref'd) (declining to hold that implied consent under the transportation code is equivalent to voluntary consent as a recognized exception to the warrant requirement); *Weems v. State*, 434 S.W.3d 655, 665 (Tex. App.—San Antonio, 2014 pet. granted) (finding that the implied consent statute and the mandatory blood draw statute are not exceptions to the Fourth Amendment's warrant requirement); *see also State v. Ruiz*, No. 13-13-00507-CR, 2015 Tex. App. LEXIS 8961, at *9 (Tex. App.—Corpus Christi Aug. 27, 2015, no pet.) (not yet published) (declining "to hold that sections 724.011(a) and 724.014(a) of the transportation code is the equivalent to voluntary consent as a recognized exception to the warrant requirement."). These cases were all decided after Applicant's conviction became final.

## Exigent Circumstances

35. Even if the police-requested blood draw was invalid under the Transportation Code, based on the totality of the circumstances, it was valid due to exigent circumstances.

36. At the time Officer Bohmer requested a specimen of Applicant's blood, exigent circumstances existed. Applicant had been involved in a major car accident. Fannie Kind had already died as a result of the accident. Willie Kind was injured as a result of the accident. Applicant himself had sustained numerous injuries and was unconscious. At the time of the request, nearly three and a half hours had already passed since the accident. (SX55; WSX2).

37. Officer Bohmer testified that "We want to get the blood then, because the longer you wait, the level [of alcohol] could decrease." (RR4:122).

38. On April 17, 2013, the Supreme Court of the United States decided *Missouri v. McNeely*, 133 S. Ct. 1552 (2013). In *McNeely*, the Supreme Court held that "in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." 133 S. Ct. at 1568. Exigency is to be determined on a case-by-case basis, based on the totality of the circumstances. *Id.* at 1556.

39. Applicant's conviction became final on February 26, 2013, nearly two months before the decision in *McNeely* was announced.

40. Applicant presents no evidence showing that *McNeely* has any application to a *final* conviction.

41. Applicant presents no evidence showing that *McNeely* applies in this case.

## TRIAL COUNSELS' PERFORMANCE

### The Lawyers

42. J.R. Cook was hired to represent Applicant at trial. (WRR:13).

43. Prior to trial, Applicant and Cook's relationship began to deteriorate.

11

44. At some point within the days leading up to trial, the trial court appointed Paul Johnson to assist Cook with Applicant's case.

45. Applicant elected to proceed to trial with Cook as his lawyer. (RR2:14). Johnson was to remain on the case and assist as second chair counsel. (RR2:14-15).

46. During the pre-trial hearing, Cook put on the record that he reviewed his file with Applicant. The following exchange took place:

> [Cook]: Just a couple of questions.
>
> Jerrell, awhile back, not that long ago, you and I's relationship wasn't that good. Would you agree with that?
>
> [Applicant]: Yes, sir.
>
> [Cook]: I really tried to work hard to repair that relationship. Would you agree with that?
>
> [Applicant]: Yes, sir, it's water under the bridge.
>
> [Cook]: Okay. And you and I have gone over your file page by page, haven't we?
>
> [Applicant]: As far as I'm aware, you have, yes.
>
> [Cook]: I'm telling you, we've gone through it, we've sat there in the holdover and gone through it, haven't we?
>
> [Applicant]: Yes, sir.
>
> [Cook]: I've made all the copies you've asked, correct?
>
> [Applicant]: Yes, sir, for now.
>
> (RR2:11-12).

47. During the pre-trial hearing, Johnson put on the record his efforts to

prepare for trial:

> [Johnson]: Jerrell, I was in court last week and Judge asked me to come by and be present for the hearing in which you all talked about your preparedness for trial. At that time he appointed me to represent you, and you understand with only a week prior to your trial taking place, I told the Court I would do everything I could to assist both the Court and you in preparing any kind of defense and assist in any way I could; is that right?

> [Applicant]: Yes, sir.

> [Johnson]: And I spoke with you both in court, I've come over and seen you in the jailhouse, I have made hard copies of the entire file, every piece of paper that's been filed, every motion, every Police Report, everything in regard to any extraneous transaction you've had in your past, and you know that I've gone over all those things because I've come over and we've sat down, we visited about all those things, so you're familiar with the fact I prepared myself just as if I was going to try this case by myself, you understand that?

> [Applicant]: Yes, sir.

> . . .

> [Johnson]: And I've done everything I could possibly do, and I've watched videotapes of your prior arrests, I've gone over all of your prior arrest reports, I've done everything I can, and I've explained to you that I'm here to assist you any way that I can; is that right?

> [Applicant]: Yes, sir.

(RR2:15-17).

## *Motion to Suppress*

48. Prior to trial, Cook filed an omnibus pretrial motion. (CR:8-18). Included in that motion was a motion to suppress. (CR:13).

13

49. During a pretrial hearing on February 21, 2011, upon inquiry from the judge, Cook intimated that he would raise a search and seizure issue in this case. (RR2:8). The following exchange took place:

> [Trial Court]: Is there a search and seizure question here from the Defense?
>
> [Cook]: There will be - - yes, there will be.
>
> [Trial Court]: All right, let's have a hearing outside the presence of the jury.
>
> Impeachment evidence of the State's witnesses. I think that would come within the Brady Rule.

(RR2:8).

50. Ultimately, the defense did not present or argue a motion to suppress evidence at trial.

## Trial Strategy

51. A review of the transcript of Applicant's trial reflects the very clear trial strategy that Applicant was guilty, not of the charged offense of felony murder, but of the lesser included offense, intoxication manslaughter.

52. An instruction regarding intoxication manslaughter was included in the trial court's charge to the jury. (CR:48-49).

## The State Overcharged

53. At trial, the defense attempted to show that the State was prosecuting Applicant for a more serious offense than he was guilty of.

54. In accordance with this strategy, at trial, Johnson cross-examined Officer Bohmer and secured the following concessions:

- That the police department filed Applicant's case as an intoxication manslaughter. (RR4:142, 145).

14

- That Officer Bohmer did not request that the District Attorney's Office re-indict the offense as a felony murder. (RR4:145).

- That Officer Bohmer had never seen a case like Applicant's charged as a felony murder. (RR4:146, 167).

- That the first time Officer Bohmer had even heard of the offense of felony murder was when he spoke with the District Attorney's Office in connection with Applicant's case. (RR4:162-63).

- That Officer Bohmer had no evidence that Applicant was speeding at the time of the crash. (RR4:148).

- That Officer Bohmer did not believe that Applicant caused the accident intentionally. (RR4:150).

- That the only evidence Officer Bohmer had of Applicant's reckless behavior was the very fact of the crash. (RR4:153-54).

55. Johnson cross-examined Assistant District Attorney Andrea Handley in a hearing outside the presence of the jury regarding the decision to re-indict Applicant's case as as felony murder. (RR4:212-35).

## *Acts Clearly Dangerous to Human Life*

56. The defense also challenged the State's proof of acts clearly dangerous to human life.

57. Cook cross-examined State's witness Curtis Benge and got him to admit that he did not know whether Applicant thought that he was making a safe lane change. (RR4:39). He got Benge to admit that Benge did not know whether Applicant was keeping a proper lookout while driving. (RR4:39). He got Benge to admit that Benge did not know what Applicant could or could not see while he was driving. (RR4:42).

15

58. Cook cross-examined Officer McMillen about the fact that lane changes and failure to control speed are traffic violations and not acts clearly dangerous to human life. (RR4:111-12, 116-17).

*Applicant's Blood*

59. During trial, in accordance with the strategy of admitting guilt to the lesser-included offense of intoxication manslaughter, Applicant stipulated to the police-requested blood draw and to his prior convictions for driving while intoxicated.

60. According to Cook, the strategy at trial was to show that the instant offense intoxication manslaughter, not felony murder. (WRR:19-20). Part of the strategy in showing that it was intoxication manslaughter was admitting to the offense of intoxication manslaughter. The following exchange took place:

> [Habeas counsel]: Well, what was your strategy with respect to stipulating to the blood alcohol?
>
> [Cook]: We were gonna argue intoxication manslaughter.
>
> [Habeas counsel]: Okay.
>
> [Cook]: So part of that is intoxication. So to sit there and then argue to keep out the intoxication, kind of negates your argument that it's intoxication manslaughter.
>
> (WRR:19).

61. At the September 11, 2015 evidentiary hearing, Cook testified that he discussed the stipulation with Applicant. (WRR:16).

62. If Applicant had not stipulated to the police-requested blood draw and the results, the State would have presented testimony from witnesses to prove the draw, the testing, and the results of the police-requested blood draw.

63. The blood evidence from the police-requested blood draw was not the only available evidence of Applicant's intoxication.

16

64. Applicant's blood was drawn when he was admitted to the hospital. At the hospital, at 11:48 p.m., Dr. Andrew Markowski, ordered that Applicant's blood be drawn and tested for, among other things, an alcohol level serum. (SX55; WSX2). That blood was drawn for medical purposes.

65. The hospital pathology report reflects that the alcohol serum level at 12:10 a.m. was 242 mg/dl.[6] (SX55; WSX2). The alcohol serum level at 4:30 a.m. was 151 mg/dl. (SX55; WSX2).

66. Because Applicant stipulated to the results of the police-requested blood draw, which was taken several hours after the offense, the jury heard evidence of a blood alcohol concentration that was lower than that in the medical-purposes draw, which was taken within 90 minutes of the offense.

67. Even if trial counsel had moved to suppress the blood evidence from the police-requested blood draw and that blood evidence was suppressed, the State would have presented and proved Applicant's intoxication using the blood evidence from the medical-purposes draw.

68. During the evidentiary hearing, Cook acknowledged that even if was successful in suppressing the blood evidence from the police-requested draw, the State "[a]bsolutely" would have moved forward with blood evidence from the medical-purposes draw. (WRR:32).

69. During the evidentiary hearing, Johnson agreed that even if the police-requested blood evidence had been suppressed, the State simply would have proceeded with the blood evidence from the medical-purposes draw. He testified:

> There's not even - - I can't even imagine a possibility where it wouldn't have happened. [Former prosecutor Brian Poe] was - - he was that well prepared.

(WRR:55).

70. During the evidentiary hearing, Johnson testified that it would not have

---

[6] The pathology report reflects that the time of the first alcohol serum level was on 4/9/09 at 12:10 a.m. (SX55; WSX2). This appears to be a clerical error as the blood was not even ordered to be drawn until 4/9/09 at 11:48 p.m. (SX55; WSX2).

made a difference to try to suppress the police-requested blood evidence because evidence regarding Applicant's intoxication was going to come in at trial. (WRR:57). The following exchange took place:

> [Habeas counsel]: Okay. I understand that, but just - - Mr. Dittman is claiming that - - as far as the mandatory blood results are concerned, that he wasn't fully informed about them. And that's the heart of this matter. And we know - - would you agree with me that if - - if a motion to suppress had been argued on the blood results, the jury wouldn't know that you were - - you were making a fuss about them, right?

> [Johnson]: Well, the - - it wouldn't make any difference if it - - if it's coming in in the trial. I mean, that's the whole point of the - - the whole point of the issue was if it's coming in, it's not being contested by the defense, it's not being - - it's not argued against by the - - by the Defendant. And the evidence - - I mean, clearly, I don't - - I don't recall exactly, but I think everybody that came into contact - - even in the state that he was in, said that he - - that he smelled of alcohol[.]

(WRR:57).

71. Applicant has no reasonable expectation of privacy in the result of the blood test taken for medical purposes.

72. The State could have proved Applicant's intoxication using the blood evidence from the medical-purposes draw by calling hospital personnel to testify to the circumstances of the draw, the testing, and the results of the testing.

73. In light of the available evidence, the decision not to pursue a motion to suppress the blood evidence was reasonable.

74. In light of the available evidence, the decision to stipulate to the taking, the testing, and the results of Applicant's blood was reasonable.

75. In light of the available evidence, the decision to focus counsel's efforts on trying to secure a conviction for the second-degree felony offense of intoxication manslaughter instead of the first-degree felony murder offense

18

was reasonable.

76. Applicant has failed to prove that counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability the results of the proceedings would have been different in the absence of counsel's errors. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Bone v. State*, 77 S.W.3d 828, 834 (Tex. Crim. App. 2002).

77. Applicant received effective assistance of trial counsel.

*Conclusions of Law*

1. The Court concludes that Applicant has failed to prove that Cook's representation fell below an objective standard of reasonableness.

2. The Court concludes that Applicant has failed to prove that Johnson's representation fell below an objective standard of reasonableness.

3. Applicant has failed to prove the first prong of *Strickland*.

4. The Court concludes that Applicant has failed to prove that the result of the proceedings would have been different.

5. Applicant has failed to prove the second prong of *Strickland*.

6. Applicant has failed to prove that Cook rendered ineffective assistance.

7. Applicant has failed to prove that Johnson rendered ineffective assistance.

8. The Court recommends that these grounds for relief be denied.

## OTHER GROUNDS

This Court finds that all grounds for relief not specifically addressed herein are without merit and should be denied.

## CONCLUSION

1. This Court concludes that Applicant has not been denied any rights guaranteed him by the United States Constitution and the Texas Constitution.

2. This Court concludes that Applicant is lawfully restrained.

3. This Court concludes that Applicant's Application for Writ of Habeas Corpus is totally without merit.

4. This Court recommends that relief be **DENIED** on Applicant's habeas application.

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | COURT NO. 2 |
| JERRELL GLENN DITTMAN | § | DALLAS COUNTY, TEXAS |

## ORDER ADOPTING
## STATE'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW AND ORDER

The Court hereby adopts and incorporates herein the above proposed findings of fact and conclusions of law submitted by the State in *Ex parte Jerrell Glenn Dittman*.

The Clerk is hereby **ORDERED** to:

1. Prepare a transcript of all papers in this cause and transmit the Court's Findings and Order, including the judgment, sentence, indictment, docket sheets, and other exhibits and evidentiary matters filed in the trial records of this cause, to the Court of Criminal Appeals as provided by Article 11.07 of the Texas Code of Criminal Procedure.

2. Send a copy of the Findings of Fact and Conclusions of Law, and the Order thereon, to Applicant's counsel and to counsel for the State by depositing the same in the United States mail.

**BY THE FOLLOWING SIGNATURE, THE COURT ADOPT'S THE STATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CAUSE NO. W10-00566-V(B).**

SIGNED AND ENTERED THIS _____ day of _____, 2015.

_____
Judge Don Adams
Criminal District Court #2
Dallas County, Texas

Respectfully submitted,

_Christine Womble_

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

**Christine Womble**
**Assistant District Attorney**
State Bar No. 24035991
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *(fax)*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document contains 5,064 words, inclusive of all content.

_Christine Womble_
Christine Womble

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served on Applicant's counsel, Robert Burns, via email on October 26, 2015.

_Christine Womble_
Christine Womble